**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **ALEATHA L. THOMAS**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**TRIZETTO PROVIDER SOLUTIONS, LLC**, and **COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION**,<br><br>Defendants. | No. 4:26-cv-00962<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

**CLASS ACTION COMPLAINT**

Plaintiff Aleatha L. Thomas ("Plaintiff"), individually and on behalf of all similarly situated persons (the "Class" or "Class Members" (as further defined below)), alleges the following against Defendant TriZetto Provider Solutions, LLC ("TPS"), and Defendant Cognizant Technology Solutions Corporation ("Cognizant") (collectively, "Defendants") based upon personal knowledge and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Plaintiff brings this class action lawsuit against Defendants for their failure to properly secure and safeguard Plaintiff's and Class Members' personally identifiable information ("PII") and protected health information ("PHI"), resulting in a massive and preventable data breach impacting what is estimated to be **more than 3.4 million individuals**.[1]

[1] *See, e.g.*, Steve Adler, *Trizetto Data Breach: PHI of 3.4 Million Individuals Exposed*, THE HIPAA JOURNAL, https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/;

2. TPS is a company that provides revenue cycle management services to healthcare providers.[2] TPS was acquired by Cognizant in 2014.[3]

3. Plaintiffs and Class Members are current and former patients of entities that utilize TPS's services.

4. According to TPS, on October 2, 2025, TPS became aware of suspicious activity within a web portal that some of TPS's healthcare provider customers use to access its systems (the "Data Breach" or "Breach").[4]

5. After an investigation, TPS determined that, beginning in November 2024, an unauthorized actor began accessing records relating to insurance eligibility verification transactions that healthcare providers process to assess insurance coverage for treatment services they provide to their patients.[5]

6. The affected PII and PHI varied by individual, but may have included the following information for patients and primary insureds: (i) name; (ii) address; (iii) date of birth; (iv) Social Security number; (v) health insurance member number (which, for some individuals, may be a Medicare beneficiary identifier); (vi) health insurer name; (vii) primary insured or dependent information; and (viii) other demographic, health, and health insurance information (collectively, "Private Information").[6] Defendants collected and maintained the aforementioned Private

---

https://ocrportal.hhs.gov/ocr/breach/breach_report_hip.jsf (search "TriZetto Provider Solutions") (reporting 3,433,965 individuals affected); **Exhibit 1** (Plaintiff's Notice of Data Breach Letter).

[2] *See The TriZetto Provider Solutions Story*, https://www.trizettoprovider.com/who-we-are/our-story; Exhibit 1.

[3] *Cognizant Completes Acquisition of TriZetto, Creating a Fully-Integrated Healthcare Technology and Operations Leader*, https://news.cognizant.com/2014-11-20-Cognizant-Completes-Acquisition-of-TriZetto-Creating-a-Fully-Integrated-Healthcare-Technology-and-Operations-Leader.

[4] *Notice of Data Breach*, https://tpsincident.kroll.com/.

[5] *Id.*

[6] *Id.*

Information during the ordinary course of providing services.

7. According to TPS, it notified affected providers of the Data Breach beginning on December 9, 2025, and offered to make all legally required notices on their behalf.[7]

8. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. As such, the risk of identity theft and fraud will remain for Plaintiff's and Class Members' respective lifetimes.

9. Armed with the Private Information stolen in the Data Breach (and a significant head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. To date, there have been no assurances offered by Defendants that all personal data or copies of data have been recovered or destroyed, or that Defendants have adequately enhanced their data security practices sufficiently to avoid a similar breach in the future.

11. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, and potential out-of-pocket expenses to remedy or mitigate the effects of the Data Breach.

[7] *Id.*

12. Plaintiff brings this class action lawsuit to address Defendants' inadequate safeguarding of Class Members' Private Information that they collected and maintained.

13. Upon information and belief, the potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left them vulnerable to an attack such as this.

14. Upon information and belief, Defendants failed to properly monitor and properly implement data security practices with regard to the computer network and systems that housed the Private Information. If Defendants had properly monitored their networks, the Breach would not have occurred.

15. Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct. The Private Information that Defendants collected and maintained is now in the hands of cybercriminals and other unauthorized third parties.

16. Plaintiff seeks to remedy these harms on behalf of herself and on behalf of all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

## II. PARTIES

17. Plaintiff **Aleatha L. Thomas** is, and at all times mentioned herein was, an individual citizen of Boise, Idaho.

18. Defendant **TPS** is a foreign limited liability company organized in Delaware and with its principal place of business at 221 Bolivar Street, Jefferson City, Missouri 65101.

19. Defendant **Cognizant** is a Delaware corporation with its principal place of business located at 300 Frank W. Burr Blvd., Suite 36, 6th Floor, Teaneck, New Jersey, 07666.

## III. JURISDICTION AND VENUE

20. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the Class is comprised of thousands of members, many of whom reside outside the state of New Jersey and have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

21. This Court has personal jurisdiction over Defendants because Defendants maintain their principal place of business in this District and/or intentionally availed themselves to the jurisdiction of this Court by marketing, employing individuals, and/or providing services in this District.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and/or substantial part of the events giving rise to this action occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. *Defendants' Business and Collection of Plaintiff's and Class Members' Private Information.*

23. TPS provides revenue cycle management services to entities within the healthcare industry.[8] Through these relationships, Defendants acquired the Private Information of Plaintiffs and the Class.

24. As entities within the healthcare industry, Defendants knew or should have known of the importance of adequate data security.

25. Plaintiff and Class Members were required to provide their Private Information to

---

[8] *The TriZetto Provider Solutions Story*, https://www.trizettoprovider.com/who-we-are/our-story.

Defendants during the course of receiving medical services.

26. Upon information and belief, Defendants promised to keep Plaintiff's and Class Members' Private Information confidential and only disclose it for authorized purposes.

27. Due to the highly sensitive and personal nature of the Private Information Defendants acquire and store, Defendants, upon information and belief, promise to, among other things: (i) keep Private Information private; (ii) comply with industry standards related to data security and the maintenance of Private Information; (iii) inform individuals of their legal duties relating to data security and comply with all federal and state laws protecting Private Information; (iv) only use and release Private Information for reasons that relate to the services they provide; and (v) provide adequate notice to Plaintiffs and Class Members if Private Information is disclosed without authorization.

28. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized access and exfiltration.

29. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendants ultimately failed to do.

**B. *The Data Breach and Defendants' Inadequate Notice to Plaintiff and Class Members.***

30. Despite Defendants' obligations to keep Plaintiff and Class Members' Private Information secure, Defendants failed to protect it, resulting in a massive and preventable data breach.

31. Defendant posted the following website notice concerning the Data Breach through

Kroll:

> TriZetto Provider Solutions ("TPS") recently experienced a cybersecurity incident that affected certain protected health information of certain of its healthcare provider customers' patients. TPS provides billing-related services to healthcare providers, such as hospitals, health systems, and physician practices.
>
> This notice explains the incident, the measures TPS has taken in response, and the steps individuals can take for further protection.
>
> **What Happened?**
>
> On October 2, 2025, TPS became aware of suspicious activity within a web portal that some of TPS's healthcare provider customers use to access its systems. Upon discovering the incident, TPS quickly launched an investigation and took steps to mitigate the issue. TPS also engaged external cybersecurity experts and notified law enforcement.
>
> TPS determined that, beginning in November 2024, an unauthorized actor began accessing some records related to insurance eligibility verification transactions that healthcare providers process to assess insurance coverage for treatment services they provide to patients. A thorough review of the affected data was conducted to identify what information was involved and the individuals to whom the data related.
>
> **What information was involved?**
>
> The affected data varied by individual and may have included the following information for patients and primary insureds: name, address, date of birth, Social Security number, health insurance member number (which, for some individuals, may be a Medicare beneficiary identifier), health insurer name, primary insured or dependent information, and other demographic, health, and health insurance information. The incident did not affect any payment card, bank account, or other financial information. At this time, TPS is not aware of any identity theft or fraud related to the use of any affected individual's information.
>
> **What TPS is doing?**
>
> After becoming aware of the incident, TPS immediately took additional protective measures to safeguard its systems and worked with leading cybersecurity experts to conduct a comprehensive investigation of the incident. TPS notified law enforcement and implemented additional security protocols designed to enhance the security of its services.
>
> TPS notified affected providers beginning on December 9, 2025, and offered to make all legally required notices on their behalf. For those providers that accepted

the offer, TPS is currently notifying affected individuals at their last known addresses.

TPS is offering affected individuals complementary identity monitoring services including credit monitoring, fraud consultation, and identity theft restoration services.

**What can affected individuals do?**

If you believe that you may have been affected by this incident and would like to enroll in credit monitoring services at no charge, click the activate now button on the right-hand side of the page or call the dedicated, toll-free call center at (844) 572-2725 between 8:00 a.m. and 5:30 p.m. Central Time, excluding major U.S. holidays.

In order for you to receive the Kroll services, you must enroll by August 9, 2026.

Although TPS has no evidence that any affected individual's information has been subject to identity theft or fraud, TPS encourages individuals to remain vigilant against incidents of identity theft and fraud, review account statements, and monitor their free credit reports for suspicious activity and to detect errors. Instructions and general information about identity theft protection are provided below.

TPS regrets that this incident occurred and any concern it may cause. TPS takes the confidentiality and security of personal information very seriously and will continue to take steps to prevent a similar incident from occurring in the future.[9]

32. Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

33. Plaintiff and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

34. Defendants' data security obligations were particularly important given the

[9] *Notice of Data Breach*, https://tpsincident.kroll.com/.

substantial increase in cyberattacks in recent years.

35. Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

**C. *The Healthcare Sector is Particularly Susceptible to Data Breaches.***

36. Defendants were on notice that the healthcare industry—and entities aiding the healthcare industry—have long been routine targets for data breaches.

37. In August 2014, after a cyberattack on Community Health Systems, Inc., the Federal Bureau of Investigation ("FBI") warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[10]

38. The healthcare sector reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[11]

39. In 2022, the largest growth in compromises occurred in the healthcare sector.[12]

40. "The healthcare sector is a top target of threat actors because of the volume and sensitivity of patient data it handles, ranging from medical history to personally identifiable

[10] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[11] IDENTITY THEFT RESOURCE CENTER, *2018 Key Findings*, available at: https://www.idtheftcenter.org/wp-content/uploads/2019/01/ITRC_2018-EOY-BREACH-REPORT-KEY-FINDINGS.pdf.

[12] IDENTITY THEFT RESOURCE CENTER, *2022 End-of-Year Data Breach Report*, available at: https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf.

information (PII) and financial records. In the first few months of 2025, healthcare organizations faced an average of 2309 attacks per week, marking a 39% increase compared to last year."[13]

41. When compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident … came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14]

42. Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset. "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[15]

43. As entities within the healthcare industry, Defendants knew, or should have known, the importance of safeguarding Private Information, including PHI, and of the foreseeable consequences of a breach. These consequences include the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**D. *Defendants Failed to Comply with HIPAA.***

---

[13] WIRE, *How Data Breaches Impact Different Industries*, https://wire.com/en/blog/the-impact-of-data-breaches-on-industries.

[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ .

[15] INSIDE DIGITAL HEALTH, *How to Safeguard Hospital Data from Email Spoofing Attacks* (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

44. Title II of HIPAA contains what are known as the Administration Simplification provisions. *See* 42 U.S.C. §§ 1301, *et seq*. These provisions require that HHS create rules to streamline the standards for handling PHI similar to the data Defendants left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

45. Upon information and belief, Defendants' Data Breach resulted from a combination of insufficiencies that indicate Defendants failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Defendants' Data Breach that Defendants either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiff's and Class Members' PHI.

46. Plaintiff's and Class Members' Private Information compromised in the Data Breach included "protected health information" as defined by C.F.R. § 160.103.

47. 45 C.F.R. § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

48. 45 C.F.R. § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

49. Upon information and belief, Plaintiff's and Class Members' Private Information included "unsecured protected health information" as defined by 45 C.F.R. § 164.402.

50. Upon information and belief, Plaintiff's and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, as a result of the Data Breach.

51. Upon information and belief, Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52. Upon information and belief, Plaintiff's and Class Members' unsecured PHI was viewed by unauthorized persons in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach.

53. It is reasonable to infer that Plaintiff's and Class Members' unsecured PHI that was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E as a result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54. It should be rebuttably presumed that unsecured PHI acquired, accessed, used, and/or disclosed in a manner not permitted under 45 C.F.R., Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

55. Given the occurrence of the Data Breach and impact such has had on victims' Private Information, it is reasonable for these victims, including Plaintiff and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

56. In addition, Defendants' Data Breach could have been prevented if Defendants had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored their obligations to patients.

57. Upon information and belief, Defendants' security failures also include, but are not limited to:

a. Failing to maintain an adequate data security system to prevent data loss;

b. Failing to mitigate the risks of a data breach and loss of data;

c. Failing to ensure the confidentiality and integrity of electronic protected health information Defendants creates, receives, maintains, and transmits in violation of 45 C.F.R. 164.306(a)(1);

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. 164.312(a)(1);

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. 164.308(a)(1);

f. Failing to identify and respond to suspected or known security incidents;

g. Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. 164.308(a)(6)(ii);

h. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. 164.306(a)(2);

i. Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. 164.306(a)(3);

j. Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 C.F.R. 164.306(a)(94); and

k. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. 164.502, *et seq*.

58. Upon information and belief, because Defendants have failed to comply with HIPAA, while monetary relief may cure some of Plaintiff's and Class Members' injuries, injunctive relief is also necessary to ensure Defendants' approach to information security is adequate and appropriate going forward. Defendants still maintain the PII/PHI of Plaintiff and Class Members. Without the supervision of the Court through injunctive relief, Plaintiff's and Class Members' Private Information remains at risk of subsequent data breaches.

**E. *Defendants Failed to Comply with FTC Guidelines.***

59. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

60. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[16] .

---

[16] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

61. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

62. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45 *et seq*. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect Private Information they collect and maintain from consumers. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

64. The FTC has also recognized that personal data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[17]

65. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

66. Defendants were at all times fully aware of their obligations to protect the Private Information of Plaintiff and Class Members yet failed to comply with such obligations. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F. *Defendants Failed to Comply with Industry Standards.***

67. As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

68. The Center for Internet Security's ("CIS") Critical Security Controls ("CSC") recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability

---

[17] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), available at: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[18]

69. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

70. Further still, the United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote

---

[18] *The 18 CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-list.

access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[19]

71. TPS and Cognizant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### G. *Defendants Breached their Duties to Safeguard Plaintiff's and Class Members' Private Information.*

[19] *Shields Up: Guidance for Organizations*, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/shields-guidance-organizations.

72. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

73. Upon information and belief, Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to properly vet and utilize vendors with adequate data security;

c. Failing to adequately protect Private Information;

d. Failing to properly monitor data security systems for existing intrusions;

e. Failing to sufficiently train employees regarding the proper handling of Private Information;

f. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g. Failing to properly vet vendors to ensure they implemented adequate data security practices;

h. Failing to adhere to HIPAA and industry standards for cybersecurity as discussed above; and/or

i. Otherwise breaching duties and obligations to protect Plaintiff's and Class Members' Private Information.

74. Upon information and belief, Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

75. Upon information and belief, had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

76. Accordingly, Plaintiff's and Class Members' lives were severely disrupted. What's more, they have been harmed because of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants.

### H. *Plaintiff and Class Members are at a Significantly Increased and Substantial Risk of Fraud and Identity Theft as a Result of the Data Breach.*

77. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such

as data breaches or unauthorized disclosure of data.[20] Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment. Consumers' loss of trust in e-commerce also deprives them of the benefits provided by the full range of goods and services available which can have negative impacts on daily life.

78. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

79. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

80. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information

[20] *FTC Information Injury Workshop, BE and BCP Staff Perspective*, FEDERAL TRADE COMMISSION, (Oct. 2018), available at: https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff-perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf.

to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

81. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

82. One such example of how malicious actors may compile Private Information is through the development of "Fullz" packages.

83. Cybercriminals can cross-reference two sources of the Private Information compromised in the Data Breach to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

84. The development of "Fullz" packages means that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card or financial account numbers may not be included in the Private Information stolen in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen Private Information is being misused,

and that such misuse is fairly traceable to the Data Breach.

85. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[21] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

86. Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

87. The Identity Theft Resource Center documents the multitude of harms caused by fraudulent use of PII in its 2023 Consumer Impact Report.[22] After interviewing over 14,000 identity crime victims, researchers found that as a result of the criminal misuse of their PII:

- 77-percent experienced financial-related problems;

[21] *See IdentityTheft.gov,* FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps.
[22] *2023 Consumer Impact Report* (Jan. 2024), IDENTITY THEFT RESOURCE CENTER, available at: https://www.idtheftcenter.org/wp-content/uploads/2023/08/ITRC_2023-Consumer-Impact-Report_Final-1.pdf .

- 29-percent experienced financial losses exceeding $10,000;
- 40-percent were unable to pay bills;
- 28-percent were turned down for credit or loans;
- 37-percent became indebted;
- 87-percent experienced feelings of anxiety;
- 67-percent experienced difficulty sleeping; and
- 51-percent suffered from panic of anxiety attacks.[23]

88. PHI is also especially valuable to identity thieves. As the FTC recognizes, identity thieves can use PHI to commit an array of crimes, including identity theft and medical and financial fraud.[24]

89. Indeed, a robust cyber black market exists in which criminals openly post stolen PHI on multiple underground Internet websites, commonly referred to as the dark web.

90. While credit card information and associated PII can sell for as little as $1–$2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute.[25]

91. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[23] *Id.* at pp. 21–25.

[24] FEDERAL TRADE COMMISSION, *Warning Signs of Identity Theft,* https://consumer.ftc.gov/articles/what-know-about-identity-theft.

[25] *Data Breaches: In the Healthcare Sector,* CENTER FOR INTERNET SECURITY, available at: https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector.

92. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[26]

93. The ramifications of Defendants' failure to keep Private Information secure are long-lasting and severe. Once it is stolen, fraudulent use of such and damage to victims may continue for years.

94. Upon information and belief, here, not only was sensitive medical information compromised, but financial information and Social Security numbers were compromised too. The value of both PII and PHI is axiomatic. The value of "big data" in corporate America is astronomical. The fact that identity thieves attempt to steal identities notwithstanding possible heavy prison sentences illustrates beyond a doubt that the Private Information compromised here has considerable market value.

95. It must also be noted that there may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[27]

---

[26] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," KAISER HEALTH NEWS (Feb. 7, 2014), available at: https://kffhealthnews.org/news/rise-of-indentity-theft/.

[27] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOVERNMENT ACCOUNTABILITY OFFICE (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf.

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

96. PII and PHI are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the dark web for years.

97. As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft, including medical identity theft, for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**I. *Plaintiff's and Class Members' Damages.***

***Plaintiff's Experience***

98. Plaintiff received healthcare services from Terry Reilly Health Services ("TRHS").

99. Plaintiff received a Notice of Data Breach Letter ("Notice Letter") from TRHS dated February 9, 2026.[28]

100. According to the Notice Letter, on or around December 9, 2025, TRHS was notified by its electronic medical record provider, OCHIN, that its business associate and clearinghouse, TPS, experienced a data breach.[29] The Notice Letter also informed Plaintiff that her name, address, date of birth, Social Security number, health insurance member number (including Medicare beneficiary identifiers), health insurer name, provider name, dependent information, and other demographic health, and health insurance information were compromised in the Data Breach.[30]

---

[28] Exhibit 1.
[29] *Id.*
[30] *Id.*

101. Plaintiff would not have provided her Private Information to Defendants had Defendants timely disclosed that their systems lacked adequate data security to safeguard Private Information from theft, and that those systems were highly susceptible to a data breach. \

102. Plaintiff suffered actual injury in the form of having her Private Information compromised and/or stolen as a result of the Data Breach.

103. Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendants for the purpose of receiving services and which was compromised in, and as a result of, the Data Breach.

104. Upon information and belief, Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

105. Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief remains in the possession of Defendants, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendants' systems have already been shown to be highly susceptible to compromise and are subject to further attacks so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect Private Information

106. Plaintiff also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of: (i) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from Plaintiff; (ii) violation of her privacy rights; and (iii) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

***Classwide Injuries***

107. Upon information and belief, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

108. Plaintiff and Class Members entrusted their Private Information to Defendants in order to receive Defendants' services.

109. Upon information and belief, Plaintiff's and Class Members' Private Information was subsequently compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from Defendants' inadequate data security practices.

110. As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having medical services billed in their names, loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of identity theft.

111. Plaintiff and Class Members may incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

112. Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

113. The Private Information maintained by and stolen from Defendants, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff

and Class Members, which can also be used to carry out targeted fraudulent schemes against Plaintiff and Class Members.

114. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants. Plaintiff and Class Members overpaid for services that were intended to be accompanied by adequate data security but were not. Indeed, part of the price Plaintiff and Class Members paid to Defendants was intended to be used by Defendants to fund adequate security of Defendants' system and protect Plaintiff's and Class Members' Private Information. Thus, Plaintiff and the Class did not receive the benefit of the bargain.

115. Upon information and belief, Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach.

116. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[31] In fact, consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up to $50 a year.[32]

117. As a result of the Data Breach, Plaintiff's, and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its purported acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to

---

[31] *See How Data Brokers Profit from the Data We Create*, THE QUANTUM RECORD, https://thequantumrecord.com/blog/data-brokers-profit-from-our-data/.

[32] *Frequently Asked Questions,* NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

118. Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

119. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing highly sensitive personal and health information of their patients is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

120. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V. CLASS ACTION ALLEGATIONS

121. Plaintiff brings this action individually and on behalf of herself and all other persons similarly situated, pursuant to Fed. R. Civ. P. 23.

122. Specifically, Plaintiff proposes the following Class, subject to amendment as appropriate:

> **Class**
>
> All citizens of the United States whose Private Information was accessed and/or acquired in the Data Breach, including all

individuals who were sent a Notice Letter.

123. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

124. Plaintiff reserves the right to modify or amend the definition of the Class, as well as add subclasses, before the Court determines whether certification is appropriate.

125. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23.

126. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of millions of individuals whose Private Information was compromised in the Data Breach. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

127. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants engaged in the conduct alleged herein;

b. Whether Defendants' conduct violated the FTCA and HIPAA;

c. When Defendants learned of the Data Breach

d. Whether Defendants' response to the Data Breach was adequate;

e. Whether Defendants unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

f. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

j. Whether Defendants breached their duty to Class Members to safeguard their Private Information;

k. Whether hackers obtained Class Members' Private Information via the Data Breach;

l. Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n. Whether Defendants knew or should have known that their data security systems and monitoring processes were deficient;

o. What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

p. Whether Defendants' conduct was negligent;

q. Whether Defendants' conduct was *per se* negligent;

r. Whether Defendants was unjustly enriched;

s. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiff and Class Members are entitled to credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

128. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

129. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

130. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over

any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

131. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

132. Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

133. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## VI. CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST DEFENDANTS)

134. Plaintiff restates and realleges paragraphs 1–133 as if fully set forth herein.

135. Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

136. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

137. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Defendants were on notice because, according to information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

138. Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect patients' Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in their possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To properly vet and monitor all vendors utilized to ensure they utilized appropriate and adequate data security to protect Plaintiff and Class Members' Private Information from a data breach;

f. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

g. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

139. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

140. Defendants' duty also arose because Defendants were bound by industry standards to protect confidential Private Information.

141. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

142. Upon information and belief, Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendants' possession.

143. Upon information and belief, Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair,

reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

144. Upon information and belief, Defendants, by their actions and/or omissions, breached their duty of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

145. Upon information and belief, Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA;

f. Failing to ensure all vendors utilized employed appropriate and adequate data security measures;

g. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

h. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

146. Upon information and belief, Defendants acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

147. Defendants had a special relationship with Plaintiff and Class Members. Plaintiff's and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information that it stored on them) from attack.

148. Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised, exfiltrated, and misused, as alleged herein.

149. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information.

150. As a result of Defendants' negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which upon information and belief, is still in the possession of third parties, will be used for fraudulent purposes.

151. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

152. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

153. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

154. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

155. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST DEFENDANTS)**

156. Plaintiff restates and realleges paragraphs 1–133 as if fully set forth herein.

157. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

158. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

159. Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

160. Upon information and belief, Defendants breached their duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate

computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

161. Specifically, Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

162. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendants' duty in this regard.

163. Upon information and belief, Defendants also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

164. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants' networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

165. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Defendants' failure to comply with both constitutes negligence *per se*.

166. Upon information and belief, Plaintiff's and Class Members' Private Information constitutes personal property that was stolen due to Defendants' negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

167. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the actual misuse of their Private Information and effort to mitigate the actual and potential impact of the Data Breach on their lives.

168. Upon information and belief, as a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

169. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST DEFENDANTS)**

170. Plaintiff restates and realleges paragraphs 1–133 as if fully set forth herein.

171. Defendants provide healthcare services and/or billing services to healthcare entities.

172. Plaintiff and Class Members formed an implied contract with Defendants regarding the provision of those services through their collective conduct, including by Plaintiff

and Class Members paying for services and/or entrusting their valuable Private Information to Defendants in exchange for such services.

173. Through Defendants' sale of services to Plaintiff and Class Members, they knew or should have known that they must protect Plaintiff's and Class Members' confidential Private Information in accordance with their policies, practices, and applicable law.

174. As consideration, Plaintiff and Class Members paid money to Defendants and/or turned over valuable Private Information to Defendants. Accordingly, Plaintiff and Class Members bargained with Defendants to securely maintain and store their Private Information.

175. Defendants accepted payment and/or possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

176. In paying Defendants and/or providing their valuable Private Information to Defendants in exchange for Defendants' services, Plaintiff and Class Members intended and understood that Defendants would adequately safeguard the Private Information as part of those services.

177. Defendants' implied promises to Plaintiff and Class Members include, but are not limited to: (i) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (ii) taking steps to ensure that the Private Information that is placed in the control of their employees is restricted and limited to achieve an authorized business purpose; (iii) restricting access to qualified and trained employees, vendors, and/or agents; (iv) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (v) applying or requiring proper encryption; (vi) implementing multifactor authentication for access; (vii) complying with HIPAA standards to

make sure that Plaintiff's and Class Members' PHI would remain protected; and (viii) taking other steps to protect against foreseeable data breaches.

178. Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of such an implied contract.

179. Had Defendants disclosed to Plaintiff and the Class that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendants.

180. As entities within the healthcare industry, Defendants recognized (or should have recognized) that Plaintiff's and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and the other Class Members.

181. Upon information and belief, Defendants violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information and/or by failing to employ vendors with reasonable and adequate security measures to secure Plaintiff's and Class Members' Private Information. Defendants further breached these implied contracts by failing to comply with their promise to abide by HIPAA.

182. Additionally, Defendants breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information they created, received, maintained, and transmitted, in violation of 45 C.F.R. 164.306(a)(1).

183. Defendants also breached the implied contracts with Plaintiff and Class Members by failing to implement technical policies and procedures for electronic systems that maintain

electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. 164.312(a)(1).

184. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. 164.308(a)(1).

185. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. 164.308(a)(6)(ii).

186. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 C.F.R. 164.306(a)(2).

187. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. 164.306(a)(3).

188. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to ensure compliance with the HIPAA security standard rules by their workforce violations, in violation of 45 C.F.R. 164.306(a)(94).

189. Defendants further breached the implied contracts with Plaintiff and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 C.F.R. 164.502, *et seq*.

190. Defendants further breached the implied contracts with Plaintiff and Class

Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 C.F.R. 164.530(c).

191. Upon information and belief, Defendants further breached the implied contracts with Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' PHI.

192. A meeting of the minds occurred, as Plaintiff and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to Defendants in exchange for Defendants' agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

193. Upon information and belief, Plaintiff and Class Members have been damaged by Defendants' conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST DEFENDANTS)**

194. Plaintiff restates and realleges paragraphs 1–133 as if fully set forth herein.

195. This Count is plead in the alternative to Count III above.

196. Plaintiff and Class Members conferred a benefit on Defendants by turning over their Private Information to Defendants and by paying for products and services that should have included cybersecurity protection to protect their Private Information. Plaintiff and Class Members did not receive such protection.

197. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from payments made to them by Plaintiff and Class Members.

198. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

199. Defendants have retained the benefits of their unlawful conduct, including the amounts of payment received from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that they failed to provide.

200. Upon information and belief, Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

201. If Plaintiff and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendants.

202. Due to Defendants' conduct alleged herein, it would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of their wrongful conduct.

203. Upon information and belief, as a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of

suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

204. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

205. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**DECLARATORY JUDGMENT**
**(ON BEHALF OF PLAINTIFF AND THE CLASS AGAINST DEFENDANTS)**

206. Plaintiff restates and realleges paragraphs 1–133 as if fully set forth herein.

207. This Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the laws and regulations described in this Petition.

208. Defendants owe a duty of care to Plaintiff and Class Members, which required them to adequately secure Plaintiff's and Class Members' Private Information.

209. Defendants still possess Private Information regarding Plaintiff and Class Members.

210. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

211. This Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Private Information and to timely notify Plaintiff and Class Members of a data breach under the common law, HIPAA, and the FTCA;

b. Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect Private Information; and

c. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure Private Information.

212. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with legal and industry standards to protect Private Information, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

b. Order that, to comply with Defendants' explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

i. engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. engaging third-party security auditors and internal personnel to run automated security monitoring;

iii. auditing, testing, and training their security personnel regarding any new or modified procedures;

iv. segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

v. conducting regular database scanning and security checks;

vi. routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii. meaningfully educating individuals about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

213. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at Defendants. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

214. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff and Class Members will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

215. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at Defendants, thus preventing future injury to Plaintiff and other individuals whose Private Information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: June 18, 2026

Respectfully submitted,

*/s/: Maureen M. Brady*
Maureen M. Brady (MO#57800)
**McSHANE & BRADY, LLC**
4006 Central Street
Kansas City, MO 64111
T: (816) 888-8010
F: (816) 332-6295
E: mbrady@mcshanebradylaw.com

Tyler J. Bean
(*pro hac vice* application forthcoming)
Kennedy M. Brian
(*pro hac vice* application forthcoming)
**SIRI & GLIMSTAD LLP**
101 Park Avenue
Suite 1300, #16982799
Oklahoma City, OK 73102
Tel: (212) 532-1091
E: tbean@sirillp.com
E:kbrian@sirillp.com